No. 17,987.

UNION PACIFIC RAILROAD COMPANY, ET AL. *v.*
ROLAND REX COGBURN, A MINOR, ET AL.
(315 P. [2d] 209)

Decided September 9, 1957. Rehearing denied September 30, 1957.

Messrs. KNOWLES & SHAW, Mr. CLAYTON D. KNOWLES, Mr. W. R. ROUSE, Mr. F. J. MELIA, of counsel, for plaintiffs in error.

Messrs. HOUTCHENS & HOUTCHENS, Mr. ELMER P. COGBURN, for defendants in error.

*En Banc.*

MR. JUSTICE HALL delivered the opinion of the Court.

PLAINTIFFS in error were defendants below and we shall refer to them as defendants or to the Union Pacific Railroad Company as the railroad. We will refer to defendants in error as plaintiffs and shall at times refer to plaintiff Roland Rex Cogburn as Rex.

Plaintiffs brought this action to recover damages for personal injuries suffered by plaintiff, Rex, arising out of a collision of a car being driven by him with a train of defendant railroad standing on and blocking a public highway crossing. Plaintiff Harry R. Cogburn, father of Rex and joint owner of the car in question, seeks to recover for damages to the car and for medical and hospital expenses incurred in caring for his son and arising out of the collision.

Trial was to a jury which found the issues in favor of the plaintiffs and awarded each of them damages. Defendants bring the case here by writ of error relying upon five points for reversal, only two of which we consider:

(1) *The evidence is insufficient to warrant submitting to the jury the question of defendants' negligence or if it was negligent submitting to the jury the question as*

*to whether such negligence was the proximate cause of
the injuries.*

(2) *The record discloses evidence of negligence on
the part of plaintiff Rex which was the sole and proxi-
mate cause of his injuries.*

There is no dispute in the evidence presented by the
parties except as to the question of the length of time
the crossing was blocked. The evidence, construed in
the light most favorable to the plaintiffs, shows the fol-
lowing: On October 22, 1954, the defendant owned main
line railroad tracks and operated trains thereon between
Fort Collins and Dent, Colorado, Dent being a few miles
south of Greeley, Colorado, these tracks run in a north-
westerly and southeasterly direction. On said date the
defendant had made up a train of slightly more than one
hundred freight cars, mostly of the gondola type loaded
with beets headed southeasterly. At a point about 1300
feet southeasterly of the highway crossing where the
collision occurred the track forks into a Y. At about 7:15
on the night in question this train proceeding south-
easterly stopped for the purpose of cutting some cars out
of the train and blocked the highway crossing. The train
was divided leaving the rear fifty-two cars blocking the
crossing, the nineteenth car from the caboose stood
across the highway, each of the nineteen cars to the
northwest of the crossing was forty feet long, the caboose
being about eight hundred feet northwest of the cross-
ing. Through the fault or negligence of one or more em-
ployees of defendant railroad a "bad cut" was made and
not all of the cars were removed. from the train that
should have been removed. It was therefore necessary
to repeat the procedure in order to remove the cars des-
ignated for removal. This whole proceeding from the
time the train was stopped until the time of the collision
consumed about one hour and fifteen minutes. The nor-
mal and usual time for such proceeding is from ten to
twenty minutes, having to make the second cut con-
sumed an additional ten to fifteen minutes. The collision

occurred about five minutes after the commencement of the second cut. At the time of the collision the lights of the caboose were scarcely visible to one approaching on the highway from the east; headlights of the engine were not visible it being about ¾ mile southeast of the crossing at the time of the collision. There was the usual cross-buck wooden railroad crossing sign on the south side of the highway and west of the crossing; there was no such sign on the north side of the highway east of the crossing; if there had ever been such a sign on the east side of the crossing it had been torn down, the only sign to the east of the crossing being a highway "All Buses Stop" sign on the north edge of the highway, very close to the track.

The top of the gondola car standing across the highway at the point of collision was ten feet five inches from the top of the rail, the bottoms of the three dumps of the car were eleven inches above the top of the rail and the straight line bottom of the car four feet three inches above the top of the rail. This car was painted red or rusty red, with yellow lettering on the sides showing "Union Pacific" in letters about one foot high and with other letters and numbers smaller in size and reaching from near the top of the car to near the straight line bottom of the car. Much of the lettering being directly above the point of impact of plaintiff's car. The evidence further shows that the train crew had been continuously on duty for thirteen and one half hours; that had the train been cut to the northwest of the crossing so as to leave the crossing open, the engine, due to the descending grade to Dent, did not have sufficient power to back the train for recoupling; had the train been stopped further to the north leaving the same number of cars uncoupled the crossing in question would have been left open, but three other highway crossings including a main highway would have been blocked. Had there been more men in the crew they could have left a watchman or two at the crossing. The train crew knew in advance that they were

going to block the crossing. Normally when there is to be an unusual delay the train is cut so as to leave the crossing open; this same train was so cut the night following the collision.

At about 8:00 p.m. on the night in question, the plaintiff, Roland Rex Cogburn, age 19, left his home about four miles southeast of the crossing driving a 1951 Ford Sedan, owned jointly by plaintiffs. The car was in good condition equipped with good lights and the windshield was clear. On leaving home he proceeded one mile west on a gravel road, two miles north on a paved road, then about one mile west on a gravel road to the railroad crossing where the collision occurred. Rex had lived in that part of the country all his life, had travelled that road and crossing twice a week for four or five months and had crossed the tracks proceeding east earlier the same day. He testified that he remembered crossing the Dent Branch track about one half mile east of the crossing where the collision occurred, and remembered approaching where he thought the second track was; does not know whether his lights were dim or bright, does not know how fast he was going nor how far ahead he could see. He looked right and left and saw no lights or cars. He saw no lights along where he knew the track to be and does not remember seeing anything in front of him; does not know how fast he was going when he crossed the first track but knows he slowed down, always slows down for tracks; the tracks are elevated so you have to slow down to see where you are going. He had never seen a train on this track before.

Warren Wiles, a witness for plaintiffs, testified that at about 7:45 p.m. on the night in question he had approached this crossing from his home about ¼ mile east of the crossing and as he approached he saw the lights of a car turning on the west side of the tracks and could see the train across the highway though it was hard to see it in the dark of night. He waited about five minutes and could not see the locomotive so turned around and

went clear around the section to his destination which was just to the west of the tracks and on the south side of the highway. He was parking his car when he heard a crash, looked toward the crossing and saw the headlights just going out real dim — he and his friend rushed to the train and found Rex pinned in his car which had collided with the train. It is hard to see the rusty red cars in the dark of night. His friend ran to the caboose and reported the collision and he ran and called for an ambulance.

Sergeant Robert Welsh, a highway patrolman with eighteen and one half years service, testified that he arrived at the scene of the accident about twenty minutes after it occurred; that the highway is a dirt and gravel road, dusty and a little rough with a few chuckholes but no real defects; there was a very gradual climb approaching the track. The road is twenty-four feet wide at the crossing and there were no warning signs except the "All Buses Stop" sign and the paint was pretty well worn off. There were no skid marks or anything to indicate that the plaintiff had slowed down or made any effort to stop. The engine was not attached to the train on his arrival, it came up later. He estimated the speed of the car at 50-55 miles per hour at the time of impact. The lawful speed limit is 60 miles. He considers 60 miles an hour a safe speed to travel at night on a road of this type approaching a railroad crossing with bright or dim lights.

The evidence does not disclose whether the vision of Rex is normal or sub-normal. There is nothing to indicate that Rex's failure to remember important facts is a result of his injuries.

Evidence of damage to the car, the hospital and doctor bills and the extent of the injuries suffered by Rex was admitted and stands uncontradicted and the sums awarded plaintiffs by the verdicts is not questioned.

Defendants moved for a directed verdict at the close of plaintiffs' case which was denied. The defendants

then presented evidence tending to show that the train blocked the crossing a much shorter time than shown by plaintiff's testimony, and offered testimony as to the reasons and necessity for blocking the crossing. At the close of the evidence defendants renewed their motion for a directed verdict which was denied. The jury returned verdicts in favor of the plaintiffs, motion for judgment notwithstanding the verdicts or in the alternative for a new trial was filed and denied and the matter is before us on writ of error.

In view of the conclusion we reach we have deemed it advisable to set forth the evidence in some detail and in a light most favorable to plaintiffs. In so doing we are not to be understood as holding that all of the evidence recited is material or admissible had objections thereto been interposed.

The defendant railroad in leaving a portion of its train standing on the track and blocking the crossing did so deliberately, intentionally and knowingly; by such action it created a condition at this crossing for which it is answerable from the moment created until terminated. Though some courts hold that the time during which a crossing is blocked is determinative of the question of a railroad's negligence, we are not in agreement with such conclusion. The condition created did not become more or less hazardous by the lapse of time, it was just as dangerous one minute after it was created as it was one hour thereafter. Lapse of time serves only to prolong, not increase the hazard.

It is common knowledge, of which we take notice, that the point of intersection of a railroad and a highway is a point of danger. Moving trains collide with moving highway vehicles, moving highway vehicles collide with standing trains, moving trains collide with standing highway vehicles. All parties to this action are chargeable with this general knowledge and in approaching, crossing and stopping at such points must use such rea-

sonable care and prudence as the conditions present require.

The general rule of law governing such cases is stated as follows:

"The care to be exercised by a railroad where a train is standing on a crossing is affected directly by the care required of a motorist approaching the crossing. Railroad employees may assume that a motorist approaching a crossing which is obstructed will exercise due care — they are not required to anticipate that the motorist may be negligent." 161 A.L.R. 115.

"Under ordinary conditions the presence of a railroad train or car upon a crossing is adequate notice to a traveler approaching the crossing and so the railroad employees need not give additional notice or warning of the danger. In fact, a visible railroad track is itself a warning of danger, and knowledge of the presence of a railroad crossing is of itself notice of the possibility of danger from trains or cars standing thereon. Therefore, in the absence of unusual circumstances, it is not ordinarily negligence to stop a train on a crossing without providing lights to warn users of the highway." 161 A.L.R. 127 to 129.

Plaintiffs admit that this is a correct statement of the law, but contend that if there are any unusually dangerous circumstances surrounding the accident the question of defendants' negligence becomes a jury question. Counsel in their brief enumerate eleven separate circumstances which they claim constitute unusually dangerous circumstances. These circumstances and our disposition thereof follow:

1. *Over 100 cars were left standing for a long period of time.*

As we have pointed out, the lapse of time neither increases nor diminishes the hazard, and it is immaterial how many cars are in the train, it is the car standing on the crossing that constitutes the danger and warning.

2. *The locomotive was disconnected from the train*

*and at a distance of one half mile to a mile from the crossing.*

This fact has no bearing on the case. The rule of law as laid down in the cases is that the cars standing on the crossing are the warning and not an engine or some other part of the train far removed from the crossing.

3. *The tracks and railroad grade were about five feet above the level of the highway.*

This statement would indicate that there was a sharp rise to the crossing. Such is not the case, the approach to the crossing was very gradual and created no additional hazard as clearly appears from photographs in evidence.

4. *The night was dark and it was very difficult to see.*

Darkness is not unusual — it is a daily phenomenon and is one of the reasons why automobiles are required by law to be equipped with headlights.

5. *More than a normal amount of time was consumed in cutting out the cars.*

While perhaps *unusual*, this circumstance did not create a more dangerous condition — it served only to prolong a condition that already existed.

6. *The track was a main line and not a siding.*

While this fact adds nothing to the danger, it might be considered a link in the chain tending to prove plaintiff Rex guilty of contributory negligence.

7. *The train crew knew it was going to block the crossing.*

Such knowledge has no bearing on the question of the danger involved in blocking the crossing.

8. *It was possible for the crew to have cut the train and leave the crossing open.*

What the crew could have done does not change the situation as created or lessen plaintiff Rex's obligation to use due care.

9. *The train crew had been on duty thirteen and one half hours.*

This fact contributes nothing unusual to the dangerous circumstance already existing.

10. *The locomotive did not have enough power to recouple the cars if the train were split to leave the crossing open.*

The power or lack of power of the locomotive is a subject entirely foreign to the issues involved.

11. *The train crew was inadequate to cut the train and open the crossing.*

The fact remains that the train was left blocking the crossing and whether done by an adequate or inadequate crew is wholly immaterial.

We conclude that there were no unusually dangerous circumstances at this crossing.

█ The standing train in and of itself is adequate notice and warning to persons on a public highway and continues as such adequate warning so long as it remains there.

In *Mabray v. Union Pacific,* 5 Fed. Supp. 397 (Colo.), an automobile was driven into the side of a standing or slowly moving train blocking Brighton Boulevard in Denver. It was dark and visibility was impaired by a snowstorm, there were no lights and no flagman, though one was usually kept on duty there. On the night in question he had gone home. A demurrer to plaintiff's complaint was sustained.

A leading case is *Coleman v. Chicago, B. & Q. R. Co.,* 287 Ill. App. 483, 5 N.E. (2d) 103, wherein the Court said:

"Where a driver knows of a track and highway crossing, and he drives his car on a dark night into a freight train standing upon the crossing, and no warning was given by the railroad company of the presence of the train on the crossing, the court ruled that, with proper headlights and driving with such care as the law requires of him, he should have seen and known of the obstruction in time to have avoided the collision, and that the railroad company owed him no duty to give

special warning of the obstruction of the crossing. Worden v. Chicago & N. W. Ry. Co., 180 Wis. 551, 193 N.W. 356."

"The law governing in such situations is epitomized in 52 Corpus Juris, 190, § 1782, where, after a resume of authorities, the rule is stated to be: "The view generally taken is that the presence of a train or cars at a crossing is sufficient notice of obstruction and of danger; that the railroad company is not bound to give any further warning as to the presence of such obstruction, and that the trainmen have a right to assume that the operator of the vehicle will act in a reasonable way to avoid a collision.""

In *St. Louis-San Francisco Ry Co. v. Guthrie*, 216 Ala. 613, 114, So. 215; the Court said:

"Why the driver did not see the train does not appear. That the environment was such that he could not see the train until so close at hand at that he could not avoid a collision does not appear. There was no light, no flagman, nor any signal to notify the driver of the presence of the train; but whether the situation was such that the trainmen ought, in the exercise of due care, to have been aware that a reasonably careful driver on the highway would likely not see the train, is by the evidence left to mere conjecture. The burden was on plaintiff to prove negligence on the part of the trainmen in the respect we have undertaken to state. In this the plaintiff wholly failed and defendant was entitled to the general charge."

In *O'Keefe, et al. v. Wabash R. Co.*, 185 F. (2d) 241 (Ill.), the Court said:

"True, it is possible that the fog made it difficult for plaintiffs to discover the presence of the engine and caboose on the crossing, but it must be remembered that the fog was a warning of the most forceful and potent character directing Vezina's as well as plaintiffs' attention to the necessity resting upon them to drive carefully and slowly enough to stop and avoid striking any object

which might reasonably be expected to be upon the highway."

In *Plante v. Canadian Nat. Rys., et al.*, 138 Me. 215; 23 Atl. (2d) 814. A guest in an automobile brought suit against the railroad and also against the host who had driven his car into a standing train. The night was dark though visibility was good. The color of the freight car was dark and the street was slick and the driver's efforts to stop were unavailing. The guest obtained a verdict against the host and the railroad. In sustaining the verdict against the host the Court said:

"There is no sound basis for contesting the dual findings as to the negligence of the defendant St. Laurent (the host) and its causal connection with the accident. Collision at a railroad crossing constitutes prima facie evidence of negligence on the part of a traveler struck on the crossing by an approaching train, or running into the side of a train standing upon, or moving across one. Hesseltine v. Maine Central Railroad Co., 130 Me. 196, 154 A. 264; Witherly v. Bangor & Aroostook Railroad Co., 131 Me. 4, 158 A. 362. Whether excessive speed or failure to watch was the basis of the verdict, there was no evidence to refute the prima facie case against him, and it is entirely obvious that it was either the sole, or a substantial, proximate cause of the damage."

In setting aside the verdict and dismissing the complaint against the railroad the Court said:

"The alternative of basing liability on a failure to warn highway traffic requires consideration of the applicable law. The proper test as to the necessity for warning, when a highway crossing is obstructed by an unlighted train at night, is whether the railway employees, in the exercise of proper care, should recognize danger of collision with a highway vehicle operated by a man of ordinary prudence."

"If a finding of negligence on the facts was proper, the same result would be inevitable since it is apparent, even with negligence assumed, that the case must fail

on causation. * * * a verdict based upon negligence is wrong if "The relation of cause and effect" between the negligent act and the accident is wanting. Plaintiff's injuries were caused by an automobile, the vision of the operator unobscured, being driven against the side of a train which should have been seen in ample time to stop the vehicle before impact. The fact that the train had been standing upon the crossing for more than five minutes had no causal connection with the event."

Plaintiff stated he did not know how fast he was driving. He could not remember whether his lights were bright or dim, did not know how far ahead he could see, could not remember whether he could see fifty feet or one hundred feet ahead. One driving under such conditions is not in the exercise of due care. He never did see this gondola car directly in front of him, a car ten feet five inches high, painted rust red and with bright yellow letters nearly a foot high painted in the side of the car, all in sharp color contrast with the dirt and gravel highway on which he was driving.

It is difficult to conceive of a case where the evidence of plaintiff's negligence could be more firmly established and there can be no question but that the negligence of the plaintiff Rex was a contributing cause, if not the sole cause of the injuries complained of.

Plaintiffs' injuries and damages being plainly the result of plaintiff Rex's negligence, clearly established by their own witnesses, there was nothing to submit to the jury on this feature of the case.

Plaintiff knew he was approaching a railroad crossing yet he paid absolutely no attention to his speed, his lights, whether bright or dim, never did see this plainly visible railroad car. C.R.S. '53, 13-4-98 (1) provides that all motor vehicles shall be equipped with head lamps that on high beam shall furnish light of such intensity as to reveal persons and vehicles at a distance of at least three hundred and fifty feet ahead. C.R.S. '53, 13-4-98 (4) provides that all road lighting beams shall be so

aimed and of such intensity as to reveal a person or vehicle at least one hundred feet ahead.

 It was the duty of the plaintiff Rex to drive at such speed and have his car under such control that he could stop in the distance within which objects ahead were visible. It was his duty to keep a proper lookout and to see that which was plainly visible.

From *Werner, et al. v. Schrader,* 127 Colo. 523; 258 P. (2d) 766, we quote with approval the following language:

"Our Court has repeatedly held that for a person to look in such a manner as not to see what must plainly be visible, is of no more effect than if he does not look at all. We said in Fabling v. Jones, 108 Colo. 144, 114 P. (2d) 1100: "To have looked in such a manner as to fail to see what must have been plainly visible was to look without a reasonable degree of care and is of no more effect than if she had not looked at all." See, also, Brickey v. Herring, 96 Colo. 181, 41 P. (2d) 298; Aaron v. Wesebaum, 114 Colo. 61, 162 P. (2d) 232."

In *Ridenour v. Diffee,* 133 Colo. 467; 297 P. (2d), we said:

"* * * it was negligence *as a matter of law* for defendant to drive his automobile into a street intersection at night in such manner that he could not stop within the distance objects were visible ahead."

The above language is applicable to the case before us and is a complete answer to plaintiffs contentions. (The above case had not been decided at the time of trial of this cause.)

Counsel for plaintiff refers to cases from other jurisdictions holding that contributory negligence is a jury question but such cases limit the rule to (a) where there is credible evidence of plaintiffs due care or (b) *where the conditions may be so deceptive* that one cannot see a train at night by the aid of normal headlights focused low as required by law until he has come into a place of danger where it is impossible to avoid a collision.

This case does not fall within either of the above rules. There is no evidence credible or otherwise that plaintiff Rex was exercising due care. There were no deceptive conditions, there was no law requiring plaintiff to have his headlights focused low, common sense would dictate that under the conditions as he described them his lights should have been bright; there was no evidence that plaintiff Rex through no fault of his own, came into a place of danger where it was impossible for him to stop and to avoid a collision. Plaintiff never saw the train, although the exercise of ordinary care under the circumstances disclosed by this record required him to do so, he made no effort to stop or to slow down.

Plaintiff Rex's testimony proves conclusively that he was driving in a careless and heedless manner, unmindful of his speed or his ability to see the road before him, wholly indifferent to the dangers inherent in driving an automobile at high speed when approaching a railroad crossing, not only a place of danger, but a place well known to him.

The judgment is reversed and the cause remanded with instructions to dismiss the complaint.

Mr. Chief Justice Moore dissents.

Mr. Justice Holland and Mr. Justice Day not participating.

Mr. Chief Justice Moore dissenting.

It is my opinion that the question of negligence on the part of the railroad company, and that of contributory negligence on the part of the plaintiff, was properly submitted to the jury under instructions adequately defining the law. In my opinion the judgment should be affirmed.