CARL F. McCANN *vs.* HERBERT F. TWITCHELL.

Cumberland. · Opinion November 24, 1917.

*Malpractice. Rule of law where presiding Justice calls the attention of the jury to certain inadmissible testimony or statements made during the progress of. the trial and directs them to disregard the same.*

Action to recover damages for alleged malpractice in setting and treating the plaintiff's left arm.

*Held:* .

THE EXCEPTIONS.

Assuming that it was error for the plaintiff to testify that the defendant said to him in the conversation between them that he, the plaintiff, could do him no harm as "he was protected by a liability insurance," we think such error is not a sufficient ground for a new trial, in view of the fact that the presiding Justice, upon his own motion, and before the case was argued to the jury, ordered the statement struck from the record and instructed the jury to pay no attention to it in their consideration of the case.

THE MOTION.

The plaintiff was bound to exercise ordinary skill and reasonable care and diligence in his treatment of the case, and to use his best judgment in the application of his skill to the case. Whether or not he did so was a question of fact for the jury which they decided in the plaintiff's favor.

A careful study of the evidence does not convince the court that the verdict of the jury is wrong, either as to the defendant's liability, or as to the amount of damages awarded the plaintiff.

Action on the case to recover damages for alleged malpractice. Defendant filed plea of general issue. Verdict for plaintiff for $4900. The case comes up on exceptions and the usual motion for a new trial. Motion and exceptions overruled.

The questions raised under the exceptions are clearly presented by the following excerpt from the bill of exceptions:

"Q. What further conversation took place in Dr. Brock's office on the 10th day of January, the date given by the doctor, when you and your brother and Dr. Twitchell were there, about the arm?

A. Well, I had been coming three weeks or so, and I had been manipulated at the Maine General under ether, and I had been

coming there, and the arm was continually getting worse, and I was mightily provoked, and I told Dr. Twitchell in a very straightforward way that I was provoked.   He said there—

MR. STROUT:   State what happened.

Q.   State what you said, give the words?

A.   Well, I told him that, and about the only thing I had was my two arms, and that I wanted the use of those arms, and I said it in strong language, which I don't remember just what I said, but he says—

Q.   What did Dr. Twitchell say?

A.   Well, he says that I couldn't do him any harm, that he was protected by a liability insurance.   (Objected to)

MR. MOREY:   Simply the conversation that took place in the office that they went into.   They went on and told the whole conversation, or parts of the conversation.   I was just asking for the whole conversation of which they asked a part, nothing further; it seems to me we are absolutely within our rights."

To the admission of the above testimony, defendant's counsel seasonably filed exceptions, and at the close of the evidence and before arguments, the presiding Justice made the following statement:

"There was certain testimony introduced, drawn out inadvertently from the last witness, the plaintiff, Mr. McCann, this morning, relating to conversation he had with Dr. Twitchell, the defendant, in which allusion was made to conversation he had with Dr. Twitchell, and as a part of that, as I recollect it, he said that Dr. Twitchell, informed him that it didn't make so much difference to him, or words to that effect, because he had liability insurance.   On consideration of that, I feel that it has a tendency to prejudice the rights of the defendant, and I shall instruct the stenographer to strike out that remark, and I shall also instruct the jury to disregard it.   Insurance is something that we take for our buildings.   We take on our automobiles, liability.   We take on our lives.   It is no indication that we intend to be careless in operating, or we intend to set our buildings afire, or that we intend to take any chances with our lives or our health, and for that reason I think it would create an unfair impression in the jury's mind, and I instruct the reporter to strike it from the record, and I also instruct and request the jury to pay no attention to that evidence when they come to consider the case. You may proceed."

Defendant claimed that he was injuriously affected by the admission of the testimony above referred to and that the subsequent instructions of the presiding Justice did not and could not overcome the effect of the testimony on the minds of the jury; that the plaintiff, on account of his conduct in introducing the testimony as he did, was entitled to no special consideration, and that the only way to fully protect the rights of the defendant and insure a full and impartial trial on the merits was to sustain the exceptions and order a new trial.

Case stated in opinion.

*McGillicuddy & Morey*, for plaintiff.

*Strout & Strout*, for defendant.

SITTING: CORNISH, C. J., SPEAR, KING, BIRD, HANSON, JJ.

KING, J. Action to recover damages for alleged malpractice in setting and treating the plaintiff's left arm. A verdict of $4900 for the plaintiff was returned, and the case comes up on the defendant's exception and motion for a new trial.

1. The excerpts from the bill of exceptions, printed by reporter, clearly states the questions presented thereunder.

Assuming, though not so deciding, that it was error for the plaintiff to testify that the defendant said, in a conversation with him concerning his liability for negligence in treating the arm, that he, the plaintiff, could do him no harm as he was protected by a liability insurance, we think such error should not be deemed a sufficient ground for a new trial in view of the fact that the presiding Justice, upon his own motion, and soon after the admission of the statement, ordered it struck from the record and instructed the jury to pay no attention to it in their consideration of the case, explaining to them fully why they should not do so.

It is not an infrequent occurrence in the trial of causes before a jury that inadmissible statements are made by witnesses before an objection is interposed, and sometimes such statements are erroneously admitted against objection. In such instances a common practice is, if the court becomes convinced, before the case is submitted to the jury, that an error has occurred, to order the inadmissible testimony struck from the record and to instruct the jury to dis-

regard it. If such an error could not be cured in that way, then many trials would go for naught, for nothing more can be done to correct the error.

While there are cases to be found in some jurisdictions holding that the erroneous admission of objectionable evidence is not cured by its withdrawal coupled with an instruction to the jury not to consider it, such cases are exceptional. The great weight of authorities is in support of the rule that ordinarily the erroneous admission of improper evidence is cured, or so far cured as to be no longer a sufficient ground for a new trial, by being withdrawn or struck from the record and an instruction given to the jury to disregard it entirely.

Our own court so decided in *State* v. *Kingsbury*, 58 Maine, 238, where it said: "When proper instructions are given, such admission is not deemed a ground for a new trial." See also to same effect *State* v. *Fortin*, 106 Maine, 362, 384. The following are a few of the many cases in other jurisdictions where the rule has been approved. *Ward* v. *Preston*, 23 Cal., 469; *Corbin* v. *Dunklee*, 14 Colo., App. 337, 59 Pac., 842; *Orr* v. *Garabold*, 85 Ga., 373, 11 S. E. 778; *Paris & D. R. Co.* v. *Henderson*, 89 Ill., 86; *Shepard* v. *Goben*, 142 Ind., 318; *Baker* v. *Oughton*, 130 Iowa, 35; *Costello* v. *Crowell*, 133 Mass., 352; *Dykes* v. *Wyman*, 67 Mich., 236; *Holmes* v. *Moffat*, 120 N. Y., 159; *Rathgebe* v. *Penn. R. Co.*, 179 Pa. St., 31; *New York L. E. W. R. R. Co.* v. *Madison*, 123 U. S., 524; *Penn. Co.* v. *Roy*, 102 U. S., 451. In the latter case, Mr. Justice Harlan, speaking of the defendant's contention that an error in admitting evidence could not be cured by an emphatic direction by the court that the jury should not consider it, said: "It cannot be sustained upon principle, or by sound reason, and is against the great weight of authority. . . . The presumption should not be indulged that the jury were too ignorant to comprehend or were too unmindful of their duty to respect, instructions as to matters peculiarly within the province of the court to determine. It should rather be, so far as this court is concerned, that the jury were influenced in their verdict only by legal evidence. Any other rule would make it necessary in every trial, where an error in the admission of proof is committed, of which error the court becomes aware before the final submission of the case to the jury, to suspend the trial, discharge the jury, and commence anew. A rule of practice leading to such results cannot meet with approval."

In the case at bar, shortly after the objectionable statement was made and permitted to stand, the presiding Justice, upon his own motion, and before the arguments, ordered the statement struck from the record, and then clearly and emphatically directed the jury not to regard it at all in their consideration of the case. It is to be presumed that the jury followed those instructions, *State* v. *Kingsbury*, supra, and that their verdict was based upon the legal evidence presented. We are, therefore, of the opinion that the defendant's exception must be overruled.

2. THE MOTION.

On November 14, 1914, the plaintiff, a young man of thirty years of age, was thrown from an automobile, and as a result the ulna of his left arm was broken and the head of the radius of the same arm was dislocated. He was at once removed to his home and the defendant took charge of his case. The broken ulna was set and the arm put in splints, but nothing was done in respect to the dislocated radius. The plaintiff claims that the defendant negligently failed to discover that the radius was dislocated, and that he did not properly treat the same after he did know of it.

After ten days the splint was removed, and the plaintiff claims that he then complained to the defendant, when an attempt was made to flex the arm, that there was a "locking" feeling at the elbow, but that the defendant did not then appear to regard that complaint seriously. On the 12th day of December, at his own insistence, as the plaintiff claims, X-Ray pictures of the arm were taken at the Maine General Hospital and they disclosed that the head of the radius had been dislocated in the accident and had remained so. A few days after that, at the defendant's suggestion, the plaintiff went to the Maine General Hospital where an unsuccessful effort was made by the defendant and other physicians to pull the radius into position, the patient being then etherized. After that the defendant for a few weeks treated the arm by flexing and moving. Dr. Abbott, who examined the arm after the X-Ray pictures were taken, advised that the only thing to be done would be to have an operation and excise the radius whereby the bones might be brought somewhat into normal position. But, as the plaintiff claims, the defendant advised against an operation. On the 27th of January, 1915, the plaintiff went to the Carney Hospital at Boston where an operation was performed on the arm and the

head of the radius was cut off and the bones placed in apposition, but union did not take place and the ulna did not remain set. A second operation was performed June 5, 1915, and the ends of the bones were morticed and fastened together, but again the bones would not unite. The next and last operation was performed December 11, 1915, when a piece of the plaintiff's shin bone was cut out and fitted into the arm bones, and a union took place, so that the plaintiff now has a shorter, but fairly serviceable, arm.

The testimony was conflicting as to the care and attention which the defendant gave in his treatment of the plaintiff's injuries on the night of the accident. In behalf of the plaintiff it is contended that the defendant was then urgently requested by the plaintiff's brother to do everything possible and spare no expense to properly care for the plaintiff, and to have an X-Ray machine used to determine the extent and nature of his injuries, and that the defendant replied that everything was all right, and that it was only a simple break. On the other hand, the defendant testified in substance, that he suspected there might be a dislocation of the head of the radius, but that the arm was so much swollen that he could not then determine that, and that he did not feel that it was safe to etherize the plaintiff owing to his then physical condition as indicated by his breathing. And he denies that he was requested to have the X-Ray used, and says that suggestion came from him.

The plaintiff also claims that the defendant did not use ordinary care, nor exercise his best judgment in his treatment of the arm, after its condition was disclosed by the X-Ray pictures, that he advised against an operation, although that was the only thing to have done, and negligently treated the arm for sometime by flexing it when it should have been immediately operated on.

But it will serve no useful purpose to attempt here any extended analysis of the evidence bearing upon the issues of fact in the case. No legal propositions, by which the defendant was bound in the discharge of his duty to the plaintiff, were in dispute. It is not urged that he did not possess the ordinary skill of members of his profession in like situation. He was bound to exercise ordinary skill and reasonable care and diligence in his treatment of the case, and to use his best judgment in the application of his skill to the case. Whether or not he did that was an issue of fact for the jury. They have decided that issue in the plaintiff's favor.

A careful study of the evidence does not satisfy us that their verdict is wrong, either as to the defendant's liability, or as to the amount of damages awarded the plaintiff. Evidence was introduced tending to show that the plaintiff's disbursements and liabilities necessarily incurred on account of the injuries to his arm amount to nearly fourteen hundred dollars. His suffering has been severe and long continued, and his arm is permanently crippled, though somewhat serviceable. The amount of the verdict is not shown to be so excessive that it ought to be disturbed.

*Exception and motion overruled.*